UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAUKAT "SAL" MAREDIA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PHILIP MORRIS USA INC., et al., <br><br> Defendants. <br>_____<br>PHILIP MORRIS USA INC., <br><br> Counter-claimant, <br><br> v. <br><br> SHAUKAT "SAL" MAREDIA, <br><br> Counter-Defendant. <br>_____ | 1:05-cv-00393-OWW-SMS <br><br> FINDINGS AND RECOMMENDATIONS TO GRANT THE MOTION OF COUNTER-CLAIMANT PHILIP MORRIS USA, INC. FOR DEFAULT JUDGMENT (Doc. 92) |

Defendant and Counter-claimant Philip Morris USA, Inc. is proceeding with a civil action in this Court. The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rules 72-302(c)(19) and 72-303. Counter-claimant has filed a motion for default judgment on the counterclaim.

I. <u>Background</u>

Defendant and Counter-claimant Philip Morris USA, Inc. (PM), removed this action from the Tulare County Superior Court on

1

March 24, 2005, with jurisdiction based on diversity of citizenship of the parties. A motion to dismiss was granted with leave to amend by order dated June 15, 2005. Amended complaints were filed by Plaintiff Shaukat "Sal" Maredia (Maredia) on July 12, 2005, November 10, 2005, and December 7, 2005. After the Court granted PM's motion to compel discovery and for sanctions in March 2006, and after Maredia failed to comply with the Court's order granting the motions, PM moved for discovery terminating sanctions on May 31, 2006. On July 17, 2006, the Court granted the motion in part and denied it in part, finding that Maredia had willfully disobeyed the Court's order and his discovery obligations (Order at 7), ordering that Maredia's claims against PM be dismissed, denying without prejudice the request to order that Maredia's answer to the counter-claim be stricken because Maredia had not been clearly warned that default judgment against him might be entered (id. at 8-9), and denying the request for entry of default against Maredia without prejudice (id. p. 9). Judgment was entered in favor of Defendant and against Plaintiff on October 12, 2006.

The counter-claim before the Court was filed by PM on August 12, 2005, and Maredia's answer Maredia was filed on September 14, 2005.

On October 30, 2006, PM moved to strike Maredia's answer to the counter-claim and to enter default and default judgment on the counter-claim. Minutes for the hearing date of December 4, 2006, reflect that the motion for default judgment was granted, and counsel was to prepare and submit a proposed default judgment to the Court and notice a prove-up hearing to establish the

amount of damages. On January 22, 2007, the Court ordered that the default of Maredia on PM's counter-claim was thereby entered, and all dates were vacated. The order was served on Maredia on January 25, 2007.

The instant motion was filed on July 19, 2007, including the motion, a memorandum in support, and declarations of Leopoldo J. Chanco and Gerald Henry Schepker, IV, with attachments. The docket reflects a declaration establishing proof of service of the moving papers by mail on July 19, 2007, on Maredia at the address listed in the docket. PM filed a supplemental memorandum in support of the motion and a certificate of service thereof on August 13, 2007.

No opposition or other appearance or response of any sort was filed by Maredia.

On August 16, 2007, PM filed a reply noting that pursuant to Local Rule 78-230(c), the absence of any opposition from Maredia prevented Maredia from being heard in opposition to the motion. Counsel for PM represented to the Court that Maredia still had not complied with either this Court's previous discovery order or his discovery obligations. (Reply p. 2.)

Counter-claimant's motion for default judgment came on regularly for hearing on August 24, 2007, in Courtroom 7 before the Honorable Sandra M. Snyder, United States Magistrate Judge. Turner Anderson Broughton and Leopoldo J. Chanco appeared telephonically on behalf of Counter-claimant Philip Morris, USA, Inc. There was no appearance by the Counter-defendant Shaukat Sal Maredia. Counsel for PM represented to the Court that they had not had any contact from Maredia since earlier in the action when

3

Maredia had counsel. The matter was argued and submitted to the Court.

## II. Default Judgment

A court has the discretion to enter a default judgment against one who is not an infant, incompetent, or member of the armed services where the claim is for an amount that is not certain on the face of the claim and where 1) the defendant has been served with the claim; 2) the defendant's default has been entered for failure to appear; 3) if the defendant has appeared in the action, the defendant has been served with written notice of the application for judgment at least three days before the hearing on the application; and 4) the court has undertaken any necessary and proper investigation or hearing in order to enter judgment or carry it into effect. Fed. R. Civ. P. 55(b); Alan Neuman Productions, Inc. v. Albright, 862 F.2d 1388, 1392 (9th Cir. 1988). Factors that may be considered by courts in exercising discretion as to the entry or setting aside of a default judgment include the nature and extent of the delay, Draper v. Coombs, 792 F.2d 915, 924-925 (9th Cir. 1986); the possibility of prejudice to the plaintiff, Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir.1986); the merits of plaintiff's substantive claim, id.; the sufficiency of the allegations in the complaint to support judgment, Alan Neuman Productions, Inc., 862 F.2d at 1392; the amount in controversy, Eitel v. McCool, 782 F.2d at 1471-1472; the possibility of a dispute concerning material facts, id.; whether the default was due to excusable neglect, id.; and the strong policy underlying the Federal Rules of Civil Procedure that favors decisions on the merits, id.

III. <u>Notice, Status of the Parties, Default</u>

Review of the docket reflects that Maredia, through his counsel, answered the counter-claim on September 14, 2005; thus, Maredia received notice of the action.[1]

As previously noted, the notice of motion and motion for default judgment were served on Maredia, who had appeared in the action.

The counter-claim reflects that PM expressly sought judgment against Maredia in an amount in excess of $150,00.00, consisting of compensatory damages, according to proof, as well as prejudgment interest, costs, expenses, and attorney's fees incurred in investigating Maredia's breach of contract claim and in prosecuting the counter-claim. (Ctr-clm. pp. 5-6.) Therefore, Maredia received notice from the face of the counterclaim of the sum sought by PM here, namely, $150,000.00. The notice was also adequate pursuant to Fed. R. Civ. P. 55(d) and 54(c), which require that a judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment. Plaintiff expressly sought in the counter-claim the amount and types of relief sought by the instant application for default judgment.

Finally, the Court implicitly granted the motion to strike Maredia's answer when it ordered that the default of Maredia be entered on January 22, 2007. Thus, the case is in a proper

---

[1] The Court notes that pursuant to counsel's motion, counsel for Maredia was permitted to withdraw on March 2, 2006, and Plaintiff's pro se status was noted in the docket; Plaintiff was also informed that he was expected to comply with all the requirements and deadlines of the Court's scheduling order, and that a failure to comply with an order of the Court might result in a recommendation that the action be dismissed, or other sanctions. The docket reflects that the Court's order was served by mail on Maredia.

5

procedural posture for the entry of default judgment.

The Court notes that in the present case, Counter-claimant has not filed with the Court an affidavit stating whether or not the Counter-defendant is in military service and showing the necessary facts to support the affidavit, or claiming an inability to determine if the Counter-defendant is in military service. See, 50 App. § 521(b). However, the Servicemembers Civil Relief Act (50 App. § 501 et seq.) expressly states that the section concerning default judgments applies to "any civil action or proceeding in which the defendant does not make an appearance." 50 App. § 521(a). Here, the Counter-defendant has appeared. Thus, under the plain terms of the statute, the Servicemembers Civil Relief Act does not apply. Therefore, the omission of an affidavit concerning Maredia's status should not preclude the entry of default judgment.

### IV. Legal Sufficiency of the Counter-claim

A default judgment generally bars the defaulting party from disputing the facts alleged in the complaint, but the defaulting party may argue that the facts as alleged do not state a claim. Alan Neuman Productions, Inc. v. Albright, 862 F.2d 1388, 1392. Thus, well pleaded factual allegations, except as to damages, are taken as true; however, necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default. Cripps v. Life Ins. Co. of North America, 980 F.2d 1261, 1267 (9th Cir. 1992); TeleVideo Systems, Inc. v. Heidenthal, 826 F.2d 915, 917 (9th Cir. 1987).

In a diversity case, the substantive law applied by the federal court is generally state law, and the federal courts

generally must follow the conflict of laws rules prevailing in the states in which they sit. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496-97 (1941). If state law governs a particular issue in a diversity case, the court must then determine the content of the applicable state law; the decision of the state's highest court is generally the definitive statement of the state's law. Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967). Absent a contractual provision governing choice of law or a litigant's invocation of the law of a foreign state, under California choice-of-law rules, the Court presumes that California law applies unless there exists a compelling reason to displace state law with the law of a foreign jurisdiction. Hurtado v. Superior Court, 11 Cal.3d 574, 581 (1974); Shanghai Automation Instrument Co. v. Kuei, 194 F.Supp.2d 995 (N.D.Cal. 2001).

Here, no contractual provision governing choice of law has been brought to the attention of the Court, and no party has invoked in connection with this motion the law of any other state. Here, the sales in question occurred within California. There is no basis for application of the law of another state.

Counter-claimant cites to California law concerning the law of contracts.

"A contract is an agreement to do or not to do a certain thing." Cal. Civ. Code § 1549. "It is essential to the existence of a contract that there should be: 1) Parties capable of contracting; 2) Their consent; 3) A lawful object; and 4) A sufficient cause or consideration." Cal. Civ. Code § 1550. The elements of a claim for breach of contract are the existence of a

contract, Plaintiff's performance thereof, Defendant's breach, and damages resulting therefrom. <u>Acoustics, Inc. v. Trepte Construction Co.</u>, 14 Cal.App.3d 887, 913 (1971).

Review of the counter-claim (Decl. of Chanco, Ex. B) reveals that it gave notice that pursuant to a retail leaders agreement executed in February 2001, Maredia was required to adhere to the terms of the agreement in order to receive $.25 for every carton of PM USA cigarettes that Maredia or his business entity sold in a face-to-face transaction to an adult consumer. The agreement was revised in September 2001 to provide for $.75 per carton and again in January 2002 to provide for a payment of $.90 per carton. With respect to PM USA price promotions, Plaintiff was required to participate in them and to execute retailer understanding forms (RUF's), which contained further terms governing PM's making of merchandising payments. (Ctr-clm. at 2-4.) Maredia expressly agreed to be bound by the terms of the agreements and RUF's. The RUF's expressly provided that PM would not pay Maredia an allowance for products sold to other retail, wholesale, or trade accounts; any sale that exceeded five cartons; and products that were not sold to an adult consumer in a face-to-face transaction (i.e., mail order and internet sales were not qualified sales). Maredia also agreed to indemnify and hold harmless PM from all claims, liabilities, and expenses and costs, including attorney's fees, that arose from or might be attributable to any error, omission, or fault of Maredia. (Ctr-clm. at 4.)

It was alleged upon information and belief that in 2001 and 2002, Maredia submitted and received payment for cigarettes that

8

were not sold to an adult consumer in a face-to-face transaction, payment for sales that exceeded five cartons, and submitted noncomplying requests for payments while falsely representing to PM that all payments he sought were for cigarette sales that complied with the express terms of the agreements. (Id. at 4-5.)

PM sued for breach of contract that occurred when Maredia sought payments under the agreements and RUF's that did not comply with the terms and conditions and thereby breached the retail leaders agreements and RUF's. PM alleged that it relied on Maredia's misrepresentations and paid Maredia in excess of $150,000.00 to which he was not entitled; PM suffered damages in that amount because of the breach of the parties' agreements. (Id. p. 5.)

The counter-claim sufficiently alleges the existence of a contract, a lawful object, Counter-claimant's performance of the contract, Maredia's breach of the contract, and the suffering by Counter-claimant of some damages from the breach.

V. Damages

Generally, the scope of proceedings on an application for default judgment involves a determination of damages, which Plaintiff must prove by evidence, whether by affidavits where an evidentiary hearing is waived, Davis v.Fendler, 650 F.2d 1154, 1161-62 (9th Cr. 1981), or by other evidence, Fed. R. Civ. P. 55(b)(2). Fed. R. Civ. P. 55(b)(2) provides in pertinent part:

> If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearing or order such references as it deems necessary and proper and shall accord a right of

9

> trial by jury to the parties when and as required by any statute of the United States.

Cal. Civ. Code § 3300 provides that for the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by the code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. Further, equitable principles provide that where consistent with public policy, the remedy of restitution of benefits is available to recoup an advantage unjustly received, retained, or appropriated. <u>Dunkin v. Boskey</u>, 82 Cal.App.4th 171, 195 (2000).

The amount of damages must be shown with reasonable certainty. <u>Steelduct Co. v. Henger-Seltzer Co.</u>, 26 Cal.2d 634, 651 (1945). Where the promisor by a wilful breach of contract has given rise to a difficulty in proof of damages, it is proper to require of the promisee only that he show the amount of damages with reasonable certainty, to resolve uncertainties against the promisor, and to permit the promisee to furnish a reasonable basis for estimating the amount of damages that constitutes the best and most convincing evidence of damages under the circumstances. <u>Id</u>.

PM offers the declaration of Gerald Henry Schepker, IV, as a demonstration of how PM arrived at the $150,000.00 figure of compensatory damages. Schepker, who holds a bachelor of science degree in accounting and has been a certified public accountant since 1994, is the director of payment integrity in the finance department at PM; he also worked for PM as a regional finance

10

1  director from 2000 through 2002, a period coinciding roughly with
2  the interval in 2001 and 2002 during which in the counter-claim
3  it is alleged that Maredia engaged in sales covered by the
4  agreements. In that capacity he worked to identify entities that
5  were reporting false or erroneous sales of PM products in an
6  effort to obtain payments to which they were not entitled under
7  various promotional programs. Schepker does not claim to have
8  personal knowledge stemming from his own observation of any of
9  Maredia's sales conduct during that time. As director of payment
10 integrity since August 2002, Schepker has been responsible for
11 ensuring that the retailers participating in PM's promotional
12 programs earned the payments that they received; his job involves
13 analyzing purchase and sale documentation that PM receives from
14 its wholesalers, who are required to report to PM, as well as
15 reviewing documentation received from participating retailers.
16 (Decl. ¶¶ 1, 4-5.)

17      Schepker details the retail leaders agreements entered into
18 by Defendant in February 2001, September 2001, and January 2002,
19 and RUF's executed by Defendant during eight specific promotional
20 periods during the life of the agreements. (Decl. ¶¶ 8-12.)
21 Maredia expressly stated that he understood that payment would be
22 made only for products sold in accordance with the terms of the
23 RUF's. (Decl. ¶ 17, Ex. B.) The RUF's provided that PM would not
24 pay promotional allowances for cigarettes that were not sold to
25 an adult consumer in a face-to-face transaction or that were sold
26 in transactions that exceeded five cartons. (Decl. ¶¶ 12-13, Ex.
27 B.) Maredia also promised in each RUF that in order to receive
28 the promotional allowances, he would maintain accurate records

11

documenting the number of packs and cartons sold in the store to adult smokers at the reduced prices during the periods and, upon request, to submit such records to PM. PM reserved the right to audit compliance at any time, to obtain upon request the documentation that the retailer was required to maintain, and to withhold payment for any noncompliance. (Decl. ¶ 17, Ex. B.)

Retailers such as Maredia received payments based on their own reporting of their sales volume by completing a payment worksheet on the front of each RUF documenting their qualifying sales, and recording the number of cartons in inventory at the commencement of a promotional period and at the end. The difference between the two inventory counts, plus the number of cartons of cigarettes that the retailer purchased from wholesalers or other vendors, minus any unqualified sales, was the basis for determining the number of cartons on which the retailer was entitled to receive promotional payments. (Id. ¶ 12.)

Schepker declared that in estimating damages, he referred to STARS, a database maintained by a third-party vendor; PM's wholesale customers reported to the third-party vendor the number of PM products sold by the wholesalers to retailers; the wholesalers who sold to Maredia at the relevant times were required by the terms of their contracts with PM to report their sales to Maredia and other retailers to the STARS database. (Decl. ¶ 20.) PM used STARS to verify the number of cartons purchased by Defendant from the wholesalers. It also used STARS to "compare a retailer's purchasing patterns and, by extension, his or her sales patterns, to that of his or her "Trade Class

Average," the average number of cartons of PM product sold by retailers that sell the same types of goods. (Decl. ¶¶ 20-21.) Maredia was in a distinct trade class of tobacco stores. (Id. ¶ 21.) PM was able to compare a retailer's PM purchases to those of other retailers in the same trade class on a local (district), regional (one of five regions in the United States), and national basis during the specific promotional periods. (Id. ¶¶ 22, 24.) PM states that it reasonably estimated the number of PM cartons sold by Maredia to adult consumers in face-to-face transactions based on the STARS record of the volume of purchases by Maredia of PM products, the type of products purchased and sold by Maredia, and the purchase and sales patterns of other retailers in Maredia's trade class.

A spreadsheet prepared at Schepker's direction and attached to the declaration provides a breakdown of how the amount was calculated. (Decl. ¶¶ 27-28.) The spreadsheet reveals calculations of variances between the amount actually paid to Maredia by PM, and amounts estimated to be amounts of average sales in the various areas or the amount of estimated payment based on STARS. Schepker states that PM analyzed Maredia's Marlboro promotional payments and compared them to his district, regional, and national Marlboro trade class averages. PM found that Maredia's payments were grossly inflated when compared to his district, regional, and national trade class averages; Maredia received PM promotional payments that were $252,203.86 greater than his national trade class average, $222,563.48 greater than his regional trade class average, and $152,611.35 greater than his district trade class average. PM has used the

lowest of the three trade class average numbers, which constitutes the most conservative estimate of the amount of damages to which PM is entitled, and exceeds the $150,000.00 claimed. (¶¶ 29- 31.)

Schepker also declares that Maredia had already received Marlboro promotional payments from PM totaling $434,731 and yet filed three suits in California state court claiming entitlement to an additional $355,516 in promotional payments, most of which related to Marlboro promotions. Further, an unannounced one-day in-store audit of Maredia's stores at an unspecified date in 2002 by unidentified members of PM's sales force who sat in the store in an effort to estimate Maredia's general sales volume raised serious concerns regarding Maredia's promotional payment claims, causing PM to withhold promotional payments subject to Maredia's providing documentation supporting his claimed sales. (Decl. ¶ 30.) Schepker does not claim to have any personal knowledge of the audit.

Schepker declared that before this lawsuit was initiated and later during discovery, PM demanded that Maredia produce documents and records to substantiate his claimed volume, but Maredia declined, even though he is the only person in possession of his records, and even though this Court has ordered him to produce such records. (Decl. ¶ 25.) Indeed, the Court granted default judgment in favor of PM on the counterclaim. Id.

PM states in its memorandum that promotional payments of over $600,000.00 were made to Defendant in 2001 and 2002, but the portion of the declaration of Schepke cited to (Memo. p. 3, ll. 22-24, Decl. ¶ 18) does not state that fact. PM also cites to the

14

first amended complaint in which Maredia as Plaintiff alleged that he earned in excess of $935,112.00 in promotional payments and acknowledged receiving over $670,475.00 from PM. (Decl. Chanco ¶ 3, Ex. A, attachment showing amounts paid for six stores.) Thus, the amount paid is established by a judicial admission on the part of Maredia.

With respect to the certainty, PM argues that because Maredia has breached his contractual obligation to provide the documentation that would establish damages with certainty, and further because Maredia has consistently failed and refused to perform his obligation to produce the documentation in the course of discovery in this action, it is appropriate to assign to Maredia the burden of proof as to damages. PM cites <u>Shanghai Automation Instrument Co. v. Kuei</u>, 194 F.Supp.2d 995, 1004 (N.D.Cal. 2001), in which in connection with a conversion claim in an action proceeding to default judgment, the court applied California law and shifted the burden of proof from the plaintiff to the tortious defendant regarding which portion of converted money was converted to the use of the defendant; the burden was shifted because the defendant there had sole possession of the records, and the matter in question was peculiarly within the knowledge or control of the defendant.

In its supplemental brief, PM also cites to <u>Sanchez v. Unemployment Ins. Appeals Bd.</u>, 20 Cal.3d 55, 71 (1977), where the California Supreme Court shifted the normal burden of proof pursuant to Cal. Evid. Code § 500 from an applicant for unemployment insurance benefits to the department of unemployment with respect to whether or not an applicant who had good cause

15

not to work on weekends was available for a substantial field of employment. The court reasoned that the data concerning the size and character of the labor market was peculiarly within the knowledge and competence of the department and could not be expected to be provided by the average unemployed claimant; further, it would be inefficient to require such data in every case. Id. In the pertinent part of a footnote, the court described the factors to be considered in determining whether the normal allocation of the burden of proof should be altered:

> Moreover, "In determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact." (Cal. Law Revision Com. com. to Evid. Code, § 500, 29B West's Annot. Evid. Code (1966 ed.) p. 431.) supra, 67 Cal.2d 733, 760; see also Garcia v. Industrial Accident Com. (1953) 41 Cal.2d 689, 694 [263 P.2d 8].

20 Cal.3d at 71, n. 16.

PM also relies on Wolf v. Superior Court, 107 Cal.App.4th 25, 35-36 (2003) (approving shifting the burden in a case involving an author's claim to contingent compensation from gross receipts of sales of from merchandising a novel's characters, where the financial records essential to the claim to compensation were in the exclusive possession of the studio, and noting that in such profit-sharing type cases where essential records are in the exclusive control of the defendant who would benefit from any incompleteness, public policy is best served by shifting the burden of proof to the defendant). The Court notes that fundamental fairness is a primary consideration in

16

determining whether or not to shift the burden of proof. <u>Adams v. Murakami</u>, 54 Cal.3d 105, 119-20 (1991).

Here, it has been established that Maredia was required to keep financial records with data that would permit the computation of damages with certainty. Thus, the Court finds that Maredia would have the best and sole source of knowledge concerning the amount of qualifying sales. Further, to the extent that any such records exist, the records are in the possession and control of Maredia, and Maredia has denied PM access to the records.

At this stage in the litigation, it would be Maredia who would benefit should the Court find the proof of his sales incomplete. Further, the efforts of both PM and the Court to have the case determined on the merits and have been delayed and obstructed. Thus, the most desirable result in terms of public policy in the absence of proof of the precise amount of carton sales is to place the burden on Maredia.

Finally, as to the probability of the existence or nonexistence of the fact, the Court considers PM's demonstration of the payments made to Maredia and the likelihood of a substantial disparity between the actual sales of PM cartons and the claimed sales. PM has demonstrated that it is more probable than not that Maredia's claimed sales were grossly inflated. It does not appear to be probable that Maredia was underpaid for his sales.

Accordingly, the Court concludes that it is appropriate to shift the burden of proof of the precise amount of damages to Maredia.

The Court is mindful that PM does not seek merchandising payments under the merchandising contracts executed by Maredia; rather, it seeks only overpayments pursuant to the RUF's. (Schepker Decl. ¶ 31.) Further, it does not seek return of all of the promotional payments that it made; rather, it seeks only $150,000.00.

Considering the foregoing, the Court finds that PM has established to the extent required that it suffered $150,000.00 in damages.

VI. Propriety of Default Judgment

In the case before the Court, it does not appear that there is any risk of mistake or excusable neglect on the part of anyone with a potential interest in the subject matter of the instant action. Further, there is no apparent likelihood of a dispute as to a material fact essential to the Counter-claimant's case. No just cause for delay appears. Because Maredia has appeared, it is not necessary to establish that Maredia is not a member of the armed services. There is no basis for concluding that Maredia is an infant or incompetent. There does not appear to be any reason why the general policy in favor of a decision on the merits would warrant refusing to enter the requested default judgment.

Accordingly, the Court finds that Counter-claimant has shown its entitlement to a default judgment.

VII. Recommendation

Accordingly, it IS RECOMMENDED that

1) The motion of Counterclaimant Philip Morris USA, Inc. for default judgment in the amount of $150,000.00 BE GRANTED; and

2) The Clerk BE DIRECTED to enter judgment in favor of

Counterclaimant Philip Morris USA, Inc., and against Counterdefendant Shaukat "Sal" Maredia, for $150,000.00 in damages.

This report and recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   August 24, 2007**              /s/ Sandra M. Snyder
                                          UNITED STATES MAGISTRATE JUDGE